UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-2339(DSD/SRN)

Judith M. Marget,

       Plaintiff,

v.                                                        **ORDER**

Fresenius Medical Care
North America,

       Defendant.

     William J. Marshall, Esq. and Babcock, Neilson, Mannella & Klint, 118 East Main Street, Anoka, MN 55303, counsel for plaintiff.

     Gregory J. Wiley, Esq. and Littler Mendelson, PC, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon cross motions for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiff's motion and grants defendant's motion.

**BACKGROUND**

This is an action for disability benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 to 1461.[1] In 1974 plaintiff Judith Marget ("Marget") was

---

[1] Under ERISA, a plan participant may bring a civil action "to recover benefits due ... under the terms of [a] plan, to
(continued...)

diagnosed with Multiple Sclerosis ("MS"). Defendant Fresenius Medical Care North America ("Fresenius") employed Marget from 1992 through June 2005, most recently as a clinical manager of a dialysis clinic. On June 25, 2005, Marget submitted an application for short term disability benefits under Fresenius's Short and Long Term Disability Plan (the "Plan"). (A.R. 208-43.)[2] Liberty Mutual Assurance Company of Boston ("Liberty Mutual"), the Plan's claim administrator, denied Marget's claim. Marget sought administrative review of Liberty Mutual's decision by Fresenius, the Plan administrator. Acting through its Employee Benefits Review Committee ("EBRC"), Fresenius determined that Liberty Mutual properly denied the claim. Marget commenced this action challenging Fresenius's decision.

Under the terms of the Plan, participants are entitled to benefits if they meet the definition of a disability. For purposes of short term disability benefits, an individual is disabled if he or she is "unable to perform all of the material and substantial duties of his or her occupation on an Active Employment basis because of an Injury or Sickness." (A.R. 214.) "Active Employment" is defined as being actively at work "for at least 30

---

[1](...continued)
enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

[2] The administrative record in this case is attached as Exhibit A to the affidavit of Gregory J. Wiley.

hours per week" and classified as a "'regular' employee." (A.R. 213.) The Plan grants Fresenius and Liberty Mutual discretionary authority and responsibility to interpret and construe the Plan's terms, to determine the rights of claimants to receive benefits and to make factual determinations in connection with benefits eligibility. (A.R. 230.)

At the time Marget applied for benefits, as a clinical manager she was responsible for coordinating and overseeing patient care and managing personnel. (A.R. 134-37.) As to the physical demands of the position, participation in patient care potentially involved heavy lifting and moving of patients and assisting with ambulation. The position could also require prolonged periods of standing, the ability to bend over and the occasional moving of machines and equipment of up to 200 pounds with assistance. (A.R. 137.) During an average eight-hour day, a clinical manager may engage in four hours of sitting; four hours of standing; two hours of climbing stairs, grasping and using fine finger dexterity; and one-half hour or less of walking, squatting, bending or reaching. (A.R. 134.)

In July 1998, Dr. Richard E. Golden, a neurologist at the Noran Neurological Clinic, Minneapolis, Minnesota, began treating Marget for MS, hypertension, migraines and transient left hemiparesis. (A.R. 65.) In October 2003, Marget suffered a right anterior cerebral artery stroke. She was admitted to a hospital on October 17, 2003, and discharged on October 21. As a result of

the stroke, Marget experienced increased fatigue and upper extremity weakness and decreased brain function and word production. On October 27, during a follow-up appointment, Dr. Golden observed a circumductive gait and a left-sided drift. (A.R. 171.) As of November 4, Marget remained unready to return to work. Although she had made substantial improvement, she continued to have a left lower facial droop and she reported concerns about her memory and concentration. (A.R. 169.)

On November 17, Dr. Golden authorized Marget to work one hour per day. (A.R. 167.) On December 20, Dr. Golden permitted Marget to return to work four hours per day because her condition had improved. (A.R. 165.) During the December 20 appointment, Dr. Golden observed overall continued improvement, although Marget still suffered facial weakness on the left side and memory and concentration issues. On January 14, 2004, Dr. Golden noted an increase in Marget's fatigue but also that her neurological condition was gradually improving. (A.R. 161.) Dr. Golden asked whether she would like to decrease her work hours, but she preferred to maintain a four-hour workday. (A.R. 162.) On February 24, Dr. Golden authorized Marget to work five to six hours per day, and she remained on a six-hour workday until she left Fresenius in June 2005. (A.R. 159.) Marget reported that although she experienced mild left upper extremity weakness, her memory and concentration continued to improve.

Marget underwent an MRI on April 9, 2004, that showed a black hole in her right anterior corpus callosum consistent with the demyelinating process of MS. (A.R. 176.) On March 14, 2005, Marget underwent another MRI that indicated "no change in appearance of the brain" compared to the April 9 MRI. (A.R. 156, 178.) On April 27, 2005, Marget saw Dr. Golden after she experienced an increase in speech difficulty and word production problems, coupled with increased fatigue. (A.R. 178). Marget informed Dr. Golden that the speech difficulties were problematic at work because of her managerial position. Marget reported that the word production difficulty presented problems when she reprimanded staff or discussed work-related issues. Because Marget had experienced similar speech difficulties as far back as September 2004, Dr. Golden concluded her symptoms were an exacerbation of preexisting disease. During her April 27 appointment, Dr. Golden observed Marget's speech to be fluent with an occasional difficulty finding words or paraphasic error, which was "a little bit problematic because of her managerial position." (A.R. 178.) However, he noted that she was capable of communicating "reasonably well enough." (A.R. 178.) Dr. Golden determined she was experiencing a "brief flare" in her demyelinating disease, MS, that was resolving. He anticipated her symptoms would resolve within six weeks. (Id.) He further noted that despite remaining on a six-hour workday he believed that she

was working in excess of the restriction. Her migraines and depression were stable, she walked without difficulty and with a normal gait. (Id.)

On June 8, 2005, Marget visited Dr. Golden for a follow-up appointment to discuss a potential adjustment in her medications. (A.R. 50.) During that appointment, Dr. Golden did not adjust any of her medications or treatments and noted no change in her condition or cognitive or physical abilities. He suggested that she consider social security disability, and she said that she would think about it. She was not scheduled to see Dr. Golden again for four months. At some point following June 8, Marget informed Fresenius that she would be leaving her employment for health reasons. However, she continued to work until June 24 because her manager asked that she stay a few weeks to smooth Fresenius's transition to a new clinical manager.

On June 24, Marget applied for short term disability benefits through the Plan because she had suffered fatigue and speech for several years as a result of her MS. (A.R. 140.) To support her claim, Marget submitted an attending physician's statement form completed by Dr. Golden. Dr. Golden reported that Marget's condition was a class 5 physical impairment - the severest classification — which is a "severe limitation of functional capacity" and renders an individual "incapable of minimum activity." (A.R. 142-43.) Dr. Golden handwrote that Marget

specifically suffered from fatigue.  Dr. Golden classified Marget's mental impairment as a class 3 impairment, on the basis that she is "able to engage in only limited stressful situations and engage only in limited interpersonal relations."  (Id.)  He included his treatment notes from Marget's April 27 and June 8 appointments with the report.  On August 2, Dr. Golden saw Marget to review her medications and complete paperwork for Social Security disability and long term disability.  (A.R. 49.)  Dr. Golden reported no changes in her condition, other than that she felt better since she had taken leave from work.

On August 4, Liberty Mutual informed Marget that she was not entitled to short term disability benefits under the Plan's definition of "disability."  Liberty Mutual based its decision upon a review of Marget's medical records of her treatment by Dr. Golden and a comparison of any restrictions on her ability to work with her job requirements.  (A.R. 130.)  Liberty Mutual took into consideration that there was no documented change in Marget's medical condition after the June 8 appointment with Dr. Golden. Liberty Mutual did not receive any information to indicate what, if anything, had changed in Marget's condition on June 25 to preclude her from continuing to perform her duties as a clinical manager. Liberty Mutual determined that as of June 25 Marget was able to perform her job duties and therefore she did not meet the Plan's definition of disability.  (A.R. 130-31.)

7

Pursuant to a letter dated August 6, 2005, Marget requested that Liberty Mutual reconsider its decision, explaining that her primary work-related problems were fatigue and decreased cognitive abilities.  Dr. Golden wrote Liberty Mutual on August 24 noting, among other things, that Marget was "a remarkably compliant patient" who "eagerly remained at work" over the past seven years, but that over the last year and a half Dr. Golden had observed "increasing amounts of white matter change in her brain which, coupled with her migraine headache disorder and hypertension," caused him to urge her to seek social security disability.  (A.R. 48.)  Dr. Golden repeated his opinion on October 19 in a one paragraph letter to "whom it may concern" that Marget had MS, which "included cognitive difficulties evident by changes in mental status evaluation," and that it was unwise for her to continue participating in direct patient care and inappropriate "for her to continue gainful employment."  (A.R. 47.)  On November 7, 2005, in response to Marget's appeal, Liberty Mutual asked Dr. Anthony Giampolo, a board certified neurologist with MLS National Medical Evaluations, to conduct an independent review of the medical records.  (Id. at 100-26.)  In addition to a review of Dr. Golden's treatment notes, Dr. Giampolo took into consideration Dr. Golden's August 24 and October 19 letters, as well as the August 6 letter written by Marget.  On November 4, 2005, Dr. Giampolo conducted a peer-to-peer consultation with Dr. Golden.

Based on a review of all the information before him, Dr. Giampolo concluded that Marget's reported impairment did not require any restrictions or limitations on her ability to work as a clinical manager.  Dr. Giampolo based this conclusion on inconsistencies in the medical record between Marget's continued physical and cognitive improvement and willingness to work and Dr. Golden's opinion that she suffered a class five physical impairment that rendered her unable to work.  Dr. Giampolo concluded that Dr. Golden's work restriction limitation of "not able to work" was inconsistent with the written medical information and the fact that she continued to work until June 24, 2005.  (A.R. 122.)  Dr. Giampolo further found no medical evidence in the record that any neurological or physical condition changed on June 24, 2005, to alter Marget's ability to work.  In reaching his conclusion, Dr. Giampolo specifically noted the physical requirements of the clinical manager position.  (A.R. 115.)  On November 23, 2005, Liberty Mutual affirmed its determination that Marget was not entitled to short term benefits under the Plan.

On January 25, 2006, Marget administratively appealed Liberty Mutual's decision to Fresenius.  (A.R. 40-43.)  In support of her appeal, she enclosed additional medical records from Dr. Golden and the Noran Neurological Clinic; the Columbia Park Medical Group, Columbia Heights, Minnesota; Dr. Philip M. Orenstein and Orenstein Physical Therapy, Minneapolis, Minnesota; and Dr. Barbara Levin

9

Krupp, a licensed psychologist. (A.R. 12-22, 44-90.) Dr. Golden had referred Marget to Dr. Orenstein for physical therapy to treat ongoing left lateral hip pain and to Dr. Krupp for psychological treatment to treat depression. Marget further submitted a residual functional capacity questionnaire for purposes of long term disability benefits completed by Dr. Golden. (A.R. 65-72.) The additional medical records that Marget provided Fresenius included notes from an appointment with Dr. Golden on November 7, 2005, where he reported that she was slightly more depressed and was experiencing some cognitive issues for which he recommended counseling. (A.R. 46.) Also included were notes from a December 21, 2005, appointment in which he commented that she had seen Drs. Orenstein and Krupp and that she was continuing to be stable but gets "very fatigued." (A.R. 44.)

On March 8, 2006, Fresenius upheld Liberty Mutual's denial of short term disability benefits because the EBRC did not find sufficient evidence to overturn Liberty Mutual's decision.[3] The EBRC was "unable to locate evidence of disability beyond June 8, 2005," determined that a functional capacity evaluation was not necessary because there was "no evidence of any change in her neurological findings that would support any increased restrictions" and found Dr. Giampolo to be credible because he is

---

[3] The EBRC originally completed its review on February 20, 2006, but conducted further review of the appeal when it received supplemental medical documentation from Marget on February 26.

a board certified neurologist and Dr. Golden's classification of Marget's condition as a Class 5 physical impairment was contradicted by the fact that Marget continued to work until June 25.  (A.R. 3.)  The EBRC concluded that Dr. Golden's class 5 classification was, at most, a potential future condition.  As to the additional medical records submitted by Marget, the EBRC determined they documented physical therapy sessions in November and December 2005 but did not establish evidence of a disability beyond June 8, 2005.  (Id.)

Marget commenced this action seeking a declaratory judgment that she is entitled to benefits under the Plan's definition of a disability and seeking recovery for back benefits, attorneys fees, costs and disbursements.  The parties now bring cross motions for summary judgment.

## DISCUSSION

**I.   Standards of Review**

**A.   Summary Judgment**

Summary judgment may be appropriate where the court reviews an administrative decision to deny or limit benefits under an ERISA plan.  See Ortlieb v. United HealthCare Choice Plans, 387 F.3d 778, 781-84 (8th Cir. 2004).  Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions

11

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See <u>id.</u> at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See <u>id.</u> at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See <u>Celotex</u>, 477 U.S. at 324. When reviewing a decision by a plan administrator to deny benefits under an ERISA plan, the court limits its review to the administrative record at the time the claim was denied. <u>Cash v. Wal-Mart Group Health Plan</u>, 107 F.3d 637, 641 (8th Cir. 1997).

**B.   ERISA Benefit Decision**

The threshold inquiry is the degree of deference the court accords Fresenius's decision. Fresenius argues that the court is to review its decision for an abuse of discretion. Marget argues

that Fresenius's decision is entitled to less deference because Fresenius both funds the Plan and determines participants' eligibility for benefits.

If a plan administrator has discretionary authority to determine eligibility, as Fresenius does under the terms of the Plan, the court generally reviews an administrator's decision for an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Ortlieb, 387 F.3d at 781. However, the court affords less deference to a plan administrator's decision if a claimant provides "material, probative evidence" demonstrating a "palpable conflict of interest or a serious procedural irregularity" that "caused a serious breach of the plan administrator's fiduciary duty" to the claimant. Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). To benefit from a less deferential review, a claimant must further establish that "the conflict or procedural irregularity has some connection to the substantive decision reached." Id. at 1161 (internal quotations omitted). If a claimant can establish a breach of fiduciary duty, sliding-scale approach and "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." Woo, 144 F.3d at 1162.

A claimant's burden to establish a breach of fiduciary duty is high and "presents a considerable hurdle." Anderson v. U.S.

Bancorp, 484 F.3d 1027, 1032 (8th Cir. 2007) (internal quotations omitted). A claimant must offer evidence that causes "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Id. (internal quotations omitted). A rebuttable presumption of a "palpable conflict of interest" can exist when an entity "funds a plan and is also the plan administrator." Id. (internal quotations omitted). However, the fact that the committee members who determine eligibility are employed by the plan administrator does not alone necessitate a finding of a conflict of interest sufficient to warrant a less deferential review. Id. Further, a plan administrator's reliance on an absence of objective medical evidence to support a denial of benefits does not constitute a "serious procedural irregularity" that warrants departing from an abuse of discretion review. Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 837 (8th Cir. 2006).

In this case, the sole conflict of interest that Marget identifies is that Fresenius is the Plan administrator and funds the Plan. Based on its dual role, Marget argues Fresenius had a financial interest in denying her claim. In addition, Marget identifies the following procedural irregularities: (1) that the independent peer review conducted by Dr. Giampolo exhibited "unexplained tunnel vision" regarding the two-week time period between June 8 and June 25, 2005, and that Dr. Giampolo

14

inexplicably focused exclusively on Marget's ability to work subsequent to June 8 and (2) that Fresenius failed to consider the entire administrative record in making its decision and failed to have an outside medical consultant review the medical records received after Dr. Giampolo conducted his independent review.

Although palpable, Marget has not presented a conflict of interest based on Fresenius's dual role sufficient to warrant a departure from an abuse of discretion review. Moreover, Marget's argument regarding procedural irregularities in the review process is belied by the administrative record, which indicates that Fresenius considered all medical documentation and treatment notes provided by Marget prior to reaching its decision. To the extent Marget challenges the weight given by Fresenius to the two-week period of time she continued to work, such an argument challenges the substantive decision reached and not the procedure used. Fresenius's decision was not arbitrary, without reflection or a product of whim, and Marget has not established a conflict of interest or procedural irregularity to warrant a sliding scale approach in this case. Therefore, the court reviews Fresenius's decision for an abuse of discretion.

**II. Fresenius's Decision**

Under an abuse of discretion review, the court must affirm a plan administrator's decision "if a reasonable person *could* have reached a similar decision, given the evidence before him, not that

15

a reasonable person *would* have reached that decision." Rutledge v. Liberty Life Assur. Co. of Boston, 481 F.3d 655, 659 (8th Cir. 2007) (internal quotations omitted).  To be reasonable, a decision must be based on substantial evidence.  Wise v. Kind & Knox Gelatin, Inc., 429 F.3d 1188, 1190 (8th Cir. 2005).  "Substantial evidence" is more than a mere scintilla, but rather what a reasonable person might accept as adequate to support the decision. Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880, 884 (8th Cir. 2002).  If a plan administrator offers a "reasoned explanation" based on the evidence, "the decision should not be disturbed even if another reasonable, but different, interpretation may be made."  Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1199 (8th Cir. 2002).

Although a plan administrator may not arbitrarily refuse to credit a treating physician's opinion, administrators are not required to "automatically accord special weight to the opinions of a claimant's physician" or to explain a decision to "credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830 (2003) (rejecting treating physician rule in ERISA actions); see also McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 925 (8th Cir. 2004) (court need not defer to treating physician's opinion over reviewing physician's opinion).  A plan administrator

16

does not abuse his discretion in finding an employee is not disabled when the record contains conflicting medical opinions. Rutledge, 481 F.3d at 660.

Marget argues that Fresenius abused its discretion in this case by denying her benefits because the EBRC relied exclusively on Marget's ability to work two additional weeks following her June 8, 2005, appointment. Marget contends that Fresenius failed to consider all the medical evidence of record and erroneously discounted the opinion of Dr. Golden. Marget further challenges the substance of Dr. Giampolo's opinion on the basis that it is self-serving and does not adequately account for the progressive nature of her MS. In support of its decision to deny Marget's application, Fresenius points to the inconsistencies between Dr. Golden's classification of Marget's disability as a class 5 — which would have rendered her physically unable to work — with her ability to continue to work. Fresenius credited Dr. Giampolo's review of the medical treatment records over Dr. Golden's opinion. The court concludes that substantial evidence supported Fresenius's decision to do so.

In reaching his opinion, Dr. Giampolo reviewed and considered the entire record, and Fresenius found no reason to question the credibility of his conclusions. (See A.R. 100-26.) There was no documented change in Marget's brain appearance between the MRI tests on April 9, 2004, and March 14, 2005; there was no evidence

17

of a change in her neurological findings subsequent to June 24, 2005, that would require increased work restrictions; Marget worked with her speech impediments since September 2004 and Dr. Golden noted that she could "communicate well enough"; Dr. Golden treated her fatigue with medication; her cognitive and physical capabilities gradually and continuously improved since October 2003; Marget continued to increase the number of her work hours to correlate with her continued improvement following her stroke in 2003; and her employer had never reported or documented that Marget's condition interfered in any way with her ability to perform the tasks of a clinical manager.

In denying Marget's claim, Fresenius directly acknowledged the "potential severity of Multiple Sclerosis," but nonetheless concluded that the written medical evidence or record did not support Dr. Golden's conclusion that she was unable to perform the job duties of a clinical manager. Fresenius — through Liberty Mutual, its independent medical reviewer and the EBRC — conducted multiple reviews of Marget's entire medical record and deferred its decision after reviewing supplemental documents from Marget.

The sole issue before Fresenius was whether Marget's MS and fatigue constituted a "disability" under the definition of the Plan. Based on the record, a reasonable person could have credited the opinion of Dr. Giampolo and determined that Marget was not "disabled" because she was able to able to "perform all of the

material and substantial duties of [her] occupation on an Active Employment basis." (A.R. 214.) Fresenius provided a reasoned explanation for its denial of benefits. Further, substantial evidence supports its decision to adopt the opinion of Dr. Giampolo, and the court finds nothing in the medical records provided after that opinion would render the denial of Marget's application an abuse of discretion. Therefore, summary judgment in favor of Fresenius is warranted.

## CONCLUSION

Based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment [Doc. No. 11] is granted.

2. Plaintiff's motion for summary judgment [Doc. No. 15] is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  June 15, 2007

                                    s/David S. Doty
                                    David S. Doty, Judge
                                    United States District Court